**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 21-CR-24-CJW-MAR |
| vs. | **ORDER** |
| JOSHUA JAMES FEYE, | |
| Defendant. | |

_____

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................ 2

II.   STANDARD OF REVIEW................................................................ 2

III.  FACTUAL BACKGROUND ............................................................ 5

IV.   ANALYSIS.................................................................................... 10

    A.    Fourth Amendment Standing to Challenge the Search of the U-Haul .....11

    B.    Probable Cause to Search the U-Haul ........................................15

    C.    Search Incident to Arrest ........................................................20

V.    CONCLUSION.............................................................................. 22

# I.     INTRODUCTION

This matter is before the Court on defendant's Objections (Doc. 64) to the Report and Recommendation (Doc. 57) of the Honorable Mark A. Roberts, United States Magistrate Judge.  On June 14, 2021, defendant filed a Motion to Suppress.  (Doc. 21).  The government timely resisted the motion.  (Doc. 28).  On July 20, 2021, Judge Roberts held a hearing on the motion (Doc. 46) and on September 1, 2021, Judge Roberts issued his Report and Recommendation ("R&R"), recommending that the Court deny defendant's motion.  (Doc. 57).  On September 29, 2021, defendant timely filed his objections to the R&R.  (Doc. 64).

For the following reasons, the Court **overrules** defendant's objections, **adopts** Judge Roberts' R&R, and **denies** defendant's Motion to Suppress.

# II.     STANDARD OF REVIEW

The Court reviews Judge Roberts' R&R under the statutory standards found in Title 28, United States Code, Section 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

*See also* FED. R. CIV. P. 72(b) (stating identical requirements).  While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask.  Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985).  Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time.  *Id*.  If a party

files an objection to the magistrate judge's report and recommendation, the district court must review the objected portions de novo. 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate [judge]'s report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

De novo review is non-deferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991); *see also Doe v. Chao*, 540 U.S. 614, 620–19 (2004) (noting de novo review is "distinct from any form of deferential review"). The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94–1609, at 3, reprinted in 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect Section 636(b))). Thus, although de novo review generally entails review of an entire matter, in the context of Section 636 a district courts required de novo review is limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1).

Consequently, the Eighth Circuit Court of Appeals has indicated de novo review would only be required if objections were "specific enough to trigger de novo review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate [judge]." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit Court of Appeals has concluded that general objections require "full de novo review" if the record is concise. *Id*. Even if the reviewing court must construe objections liberally to require de novo

review, it is clear to this Court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Ass'n, Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996).

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996); *see also Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Federal Rule of Civil Procedure 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed).

The Court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (citation omitted). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Med. Clinic, P.C.*, 498 F.3d 837, 847 (8th Cir. 2007), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this Court to believe

4

that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* FED. R. CIV. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the Court believes one further caveat is necessary: a district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153–54. Thus, although a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.

### III. FACTUAL BACKGROUND

Based on the evidence submitted and testimony elicited at the suppression hearing, Judge Roberts made extensive factual findings. Defendant does not object to any of these findings, so the Court reviews them for plain error. On review, the Court finds that Judge Roberts thoroughly and accurately summarized the relevant facts in his R&R. (Doc. 57, at 5–12). Thus, the Court adopts and incorporates the R&R's factual findings without modification.

> On February 14, 2020, Laura Suchomel rented a U-Haul van (the "U-Haul" or "van") in Cedar Rapids, Iowa. (Def. Ex. C). Two men accompanied Ms. Suchomel to the U-Haul rental center when the van was rented, Curtis Prescott and an acquaintance of Mr. Prescott's, whom Ms. Suchomel did not know. This unidentified man appears to be the defendant in this case, Joshua Feye. Soon after renting the van, Ms. Suchomel gave the keys to Mr. Prescott. (Suchomel Hr'g Test). Mr. Prescott drove away from the U-Haul rental facility in the van with Defendant and without Ms. Suchomel. (*Id.*). Ms. Suchomel testified that she had rented the U-Haul

for Mr. Prescott because he was unable to do so himself. (*Id.*). Ms. Suchomel said that she was "okay with" Mr. Prescott operating the vehicle. (*Id.*). Ms. Suchomel also testified that she was "fine with" Defendant accompanying Mr. Prescott. (*Id.*). Ms. Suchomel said she trusted Mr. Prescott with the van. (*Id.*). However, Ms. Suchomel testified that she only expected Mr. Prescott to be in control of the vehicle. (*Id.*). Ms. Suchomel never conveyed this desire to either Defendant or Mr. Prescott. (*Id.*). Ms. Suchomel never used the van herself and only found out something might have happened to the U-Haul after a phone call from Mr. Prescott's girlfriend who called her and said the van "was involved in an accident or something happened, it was pulled over." (*Id.*). Based on this information, Ms. Suchomel called U-Haul and extended the rental for another day. (*Id.*). Mr. Prescott subsequently informed Ms. Suchomel that "everything was fine" with the van. (*Id.*)

At approximately 1:25 p.m. on February 17, 2020, the Marion Police Department received a report that a teenage girl was seen entering the back of an eastbound U-Haul truck. (Def. Ex. H at 1). About six minutes later, Officer Amanda Clark spotted a UHaul parked in the front yard of 417 West 8th Avenue. (Def. Ex. A. at 1:00). This house was known as a "drug house, a flop house," by Marion police officers. (Clark Hr'g Test). Officer Clark approached the driver's side of the van and spoke with Defendant who rolled the window down. (Def. Ex. A at 1:15). Officer Clark told Defendant that Marion Police had received a report about the U-Haul and asked if Defendant had picked anyone up. (*Id.* at 1:26-30). Defendant indicated that all the individuals in the vehicle were of age. (*Id.* at 1:32, 1:55).

Officer Clark next asked Defendant for his name and date of birth. (*Id.* at 1:55). Defendant answered that his name was "Jordan Fuie." (*Id.* at 2:00). Defendant answered that his date of birth was April 24, 1983. (*Id.* at 2:07). Officer Clark asked Defendant if he was there to move someone from the house, before radioing the law enforcement dispatcher ("dispatch") to confirm Defendant's identity. (*Id.* at 2:25). Officer Clark again asked Defendant for his name. (*Id.* at 3:20). Officer Clark and Defendant continued to discuss the spelling of Defendant's name as Officer Clark struggled to identify Defendant through subsequent radio dispatches. (*Id.* at 3:20-4:30). Defendant denied he had an Iowa driver's license (*Id.* at 4:34), denied he knew his Social Security Number (*Id.* at 4:42), and denied he had a debit card that had his name on it. (*Id.* at 4:51). Defendant indicated only that he had borrowed the U-Haul from a friend. (*Id.* 5:02).

6

Officer Clark stated she needed to identify the individuals in the back of the UHaul. (*Id.* at 5:10). As Officer Clark and Officer Wilson identified the individuals in the back of the van, dispatch identified a "Jordan Feye" with a different date of birth than Defendant had provided. (*Id.* at 6:00). Officer Clark radioed dispatch that Defendant appeared nervous and that he was giving conflicting answers when asked his name. (*Id.* at 6:56). Three individuals in the back of the van stated that they did not know Defendant or the renter of the property where the U-Haul was parked. (*Id.* at 7:49-8:30). Officer Clark stated she noticed two needles on the ground near the rear door of the truck where the three individuals who had been removed from inside the van were now standing. (Clark Hr'g Test). She later testified that those needles had been on the ground for some time. (*Id.*).

As Officer Clark continued questioning Defendant, she eventually received information from an Iowa probation officer and another Marion Police officer that made her believe Defendant would be identified as "Josh" rather than "Jordan." (*Id.* at 18:05). Officer Clark asked Defendant whether he had any identifying tattoos. (*Id.* at 17:53). Defendant did not audibly respond to this question, though Officer Clark indicated that Defendant shook his head no to the question. (*Id.* at 19:20). Officer Wilson then moved to the driver's side window and began asking Defendant questions. Defendant produced rental paperwork for the U-Haul when prompted to do so by Officer Wilson. (*Id.* at 19:25). However, Defendant supplied a long-expired rental agreement. (*Id.* at 22:00-35). This rental agreement was between U-Haul and an apparently unrelated third party and had expired on November 8, 2019. (Gov. Ex. 2). Although Defendant produced an unrelated rental agreement initially, he did proffer some accurate information as to the U-Haul's true rental status. Defendant stated "Laura" had rented it for Defendant's friend "Curtis." (Def. Ex. A at 22:10-30).

Officer Wilson asked Defendant, "You're Josh, right?" (*Id.* at 20:24). She informed Defendant that "Josh's" probation officer was on his way to identify Josh and Defendant could save him a trip if he would tell her his real name. (*Id.* at 21:25-40). Officer Wilson eventually identified a tattoo on Defendant's arm. (*Id.* at 23:35). Officer Wilson warned that if Defendant kept lying about his identity he may be charged with interference with official acts. (*Id.* at 24:14). Defendant responded that he was "going back to prison regardless" and that the officers could not help him. (*Id.* at 24:30).

Officer Mitch Walser then showed a picture to Officer Clark that appeared to show Defendant. (*Id.* at 25:00). This picture allowed officers to presumptively identify Defendant as Joshua Feye, who had outstanding warrants for his arrest. (*Id.* at 25:10; Gov. Ex. 1). Officers asked Defendant to step out of the vehicle and detained him. (Def. Ex. A at 25:15).

Officer Clark noted to another officer that she believed she had seen a "needle" or "needle cap" drop from the Defendant as he exited the vehicle. (*Id.* at 26:50). Officer Clark walked back to the driver-side of the U-Haul and appeared to look in the window of the van before returning to the squad car where Defendant was detained. (*Id.* at 27:05–15). Officer Clark again mentioned seeing a needle cap, this time to Officer Walser. (Id. at 27:46-52). Officer Clark walked back unaccompanied to the U-Haul and quickly opened and closed the driver-side door. (*Id.* at 27:57-28:01). Officer Clark then told Officer Walser, "Yeah, there's some needles in there. I don't know if I really have a right, but there are some needles right in the door handle." (*Id.* at 28:02-11). Officer Walser immediately responded, "We will look at them again." (*Id.* at 28:12-13). Officer Clark once again walked back to the U-Haul and opened the driver-side door, this time pointing out the needle location to Officer Walser. (*Id.* at 28:25-28:40). Officer Clark indicated she believed that one of the needles contained heroin. (*Id.* at 30:17). Officer Clark returned to her squad car, called her supervisor, and continued to try to positively identify Defendant through dispatch. (*Id.* at 30:30-37:30).

Officers then met with the tenant of the house. (*Id.* at 38:37). The tenant noticed the two needles located outside of the vehicle and asked that they be removed. (*Id.* at 38:42). Officer Clark responded that they would attempt to remove the needles and get them tested. (*Id.* at 39:07). Discussion between the tenant and officers seems to indicate that they knew each other from prior interactions. (*Id.* at 40:30-41:00). Officers discussed the history of the residence. (*Id.* at 1:01:30). Officer Walser stated, "The only reason why people are [in this house] is to use dope. It's not a secret. We know. Everybody we [have] pulled out of here has been on dope. Three-fourths had dope on them." (*Id.* at 1:01:32-40).

Officers searched the house for several unaccounted-for individuals. (*Id.* at 1:04:30-35). Officers located several individuals with outstanding warrants. (*Id.* at 1:04- 39). Officer Clark returned to her squad car to write a preliminary report of the incident and an interference with official acts citation. (*Id.* at 2:11:00). In combination with the interference charge,

Defendant was arrested for fleeing from custody on two possession of products intended for the manufacture of controlled substances and possession of a controlled substance second offence. (Gov. Ex. 1 at 3).

After preparing the interference charge, Officer Clark returned to the residence. (Def. Ex. A at 2:17:05). Officer Clark notified several detectives who had recently arrived on the scene that she had seen needles inside the U-Haul van. (*Id.* at 2:17:06- 18:00). One detective noted they would probably need a warrant to search the van. (*Id.* at 2:17:21). Officer Clark confirmed that Defendant had not given consent to search the van. (*Id.* at 2:18:00). After hearing Officer Clark's recollection of Defendant's detention, another detective commented that they should tow the U-Haul back to the police department and then obtain a search warrant. (*Id.* at 2:18:05-17).

Officers discussed the presence of the needles in the driver-side door and how they might obtain a warrant to search the U-Haul:

| | |
|---|---|
| Officer Clark: | There's two needles in there. |
| Detective: | Where at? |
| Officer Clark: | Right in the door. |
| Detective: | Did they give you consent to search it? |
| Officer Clark: | No. He wouldn't tell us his name. . . I'll show |

you.

| | |
|---|---|
| Detective: | Well hold on. Let's talk to him. . . . |
| Officer Clark: | When we pulled him out, a needle cap fell down, so I asked him what was in there, opened the door and it's sitting there in plain view. |
| Detective: | Oh perfect, okay we might just tow it back to the P.D. and get a search warrant. |

(Def. Ex. A at 2:17:31-18:16.)

After several more moments, Officer Clark again discussed what to do with the U-Haul with two of the detectives:

| | |
|---|---|
| Officer Clark: | You guys want it towed? |
| Detective: | Huh? |
| Officer Clark: | Is there anything else in it? Because they all had bags and stuff, but I bet they took them with them. |
| Detective: | Well, yeah, but we can't just hop in there and |

|              | start searching.                                        |
| Officer Clark: | No, I know.  It's in plain view.                      |
| Detective:     | What we'll do, is we'll just do a search warrant.     |
| Officer Clark: | So, you want it towed to the P.D.?                    |
| Detective:     | Yeah.                                                  |
| Officer Clark: | Can we at least get it started?                       |
| Detective:     | Yep, that'd be awesome.                               |

(*Id.* at 2:20:35-58).  Officer Clark then radioed to begin the tow process. (*Id.* at 2:21:14).  The U-Haul was subsequently towed to the Marion Police Department.  (Def. Ex. B at 1).  The next day, Officer Nick Martens applied for a search warrant to look for illegal controlled substances within the van.  (*Id.*)

The warrant was issued on February 18, 2020 and executed on February 19, 2020.  In the U-Haul, the officers found syringes, one of which contained methamphetamine.  (Doc 22).  Officers also found a drawstring bag located between the driver and passenger seats that contained, among other things, a bag of unused syringes, an Iowa Department of Corrections identification card for Joshua Feye, and mail belonging to Joshua Feye.  (*Id.*).  In addition, officers found a Nike backpack between the two front seats containing, among other things, a glass pipe, a 30-round magazine loaded with "AR" ammunition, a partially filled box of Hornady Black AR ammunition, and four syringes. (*Id.*).  The front passenger compartment of the van was separated from the rear cargo area of the van by a metal grate.  (Def. Ex. D.)

Defendant was subsequently indicted on one count of violating 18 U.S.C. Sections 922(g)(1) and 922(g)(3), Possession of Ammunition by a Felon and an Unlawful Drug User, and one count of violating 21 U.S.C. Section 844, Possession of Methamphetamine.  (Doc. 2).  The indictment was subsequently amended to reflect that the incidents described below occurred beginning February 17, 2020 and not February 19, 2020.  (Doc. 26).

## IV.    ANALYSIS

Judge Roberts found that (1) defendant does not have standing to challenge the search of the U-Haul under the Fourth Amendment, (2) defendant does have standing to challenge the search of the bags found within the U-Haul under the Fourth Amendment, (3) police possessed probable cause to search the U-Haul without a warrant, (4) the search

of the U-Haul qualifies as a search incident to arrest, (5) the search warrant for the U-Haul was sufficiently particular, (6) the *Leon* good faith exception would save the warrant even if it were deficient, and (7) an inventory search of the U-Haul would not have inevitably uncovered the evidence in question. (Doc. 57, at 13–59).

Defendant lodges three objections to the R&R. Specifically, defendant objects to the conclusion that (1) he does not have standing to challenge the search of the U-Haul, (2) police possessed probable cause to search the U-Haul, and (3) the search of the U-Haul qualifies as a search incident to arrest. (Doc. 64, at 1). Defendant also objects to the broader recommendation that the Court deny his motion to suppress. (*Id.*, at 2).

## A. *Fourth Amendment Standing to Challenge the Search of the U-Haul*

The Fourth Amendment protects people from unreasonable seizures of their person or property. *See* U.S. CONST. amend. IV. Warrantless seizures are presumptively unreasonable and therefore precluded by the Fourth Amendment, subject to a handful of "jealously and carefully drawn" exceptions. *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971) (quoting *Jones v. United States*, 357 U.S. 493, 499 (1958)). Indeed, courts have "viewed with disfavor practices that permit police officers unbridled discretion to rummage at will among a person's private effects." *Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018). The rights protected by the Fourth Amendment are personal, however, and may not be asserted vicariously. *See Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978). Thus, for a person to claim protection from such a rummaging they must first demonstrate that they have had their "*own* Fourth Amendment rights infringed by the search and seizure which [they] seek to challenge." *Id.* at 133 (emphasis added). A defendant may establish Fourth Amendment standing by showing "that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). Conversely, a defendant who is unable to "prove a sufficiently close connection to the relevant places or objects

11

searched . . . has no standing to claim that they were searched illegally." *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994).

The principal question here is thus whether defendant had a reasonable expectation of privacy in the U-Haul van. To answer that question, "there is no single metric or exhaustive list of considerations, but a defendant's expectation of privacy must be grounded in property law or understandings that are recognized by society." *United States v. Bettis*, 946 F.3d 1024, 1027 (8th Cir. 2020). For example, if a defendant can show that he had permission to use the vehicle that was searched, "he would have a privacy interest giving rise to standing." *Id.* (quotations omitted). Other factors relevant to a determination of standing are (1) ownership, possession, or control of the area searched, (2) historical use of the property or item, (3) ability to regulate access to the area searched, and (4) the totality of the circumstances surrounding the search. *Gomez*, 16 F.3d at 256 (citing *United States v. Sanchez*, 943 F.2d 110, 113 (1st Cir. 1991)).

In assessing these factors, Judge Roberts found that defendant's right to assert Fourth Amendment protections was supported by the fact that defendant had possession and control of the vehicle, had some ability to regulate access to it, and evinced some degree of a subjective expectation of privacy in the vehicle. (Doc. 57, at 14–23). These factors are outweighed, however, by the fact that defendant did not own the vehicle or have permission to drive, possess or control it, was not lawfully licensed to drive, had control of the vehicle for less than one day, and lacked an overall objective expectation of privacy. (*Id.*). Thus, Judge Roberts concluded that defendant does not have standing to challenge the search of the U-Haul. (*Id.*, at 23). Defendant counters that actual ownership of the U-Haul is not required to assert Fourth Amendment protections and that he had implied permission to use the U-Haul, that his use of the U-Haul for a short period of time does not diminish his expectation of privacy in it, and that his expectation of privacy is objectively reasonable. (Doc. 64, at 2–5).

The Court agrees that actual ownership in a vehicle is not a necessary prerequisite to the assertion of Fourth Amendment protections. The owner of the vehicle here is U-Haul, but by the very nature of U-Haul's ownership, the vehicle will almost certainly be in the possession of someone else if it is subject to a search by law enforcement. It is well-established that the lessee of a vehicle has an expectation of privacy in that vehicle and that such an expectation is objectively reasonable. Thus, Ms. Suchomel may assert Fourth Amendment protections against a warrantless search of the U-Haul as the lawful lessee. (Docs. 35-1, 42, 45-1). It is also settled that a person who has permission directly from the lessee to use a rented vehicle may assert Fourth Amendment protections even absent authorized use by the vehicle's owner. Thus, Mr. Prescott may assert Fourth Amendment protections against a warrantless search of the U-Haul because Ms. Suchomel granted him express permission to possess and operate the vehicle. (Doc. 61, at 12).

Here defendant did not obtain permission from the lawful lessee to possess or operate the vehicle. Rather, defendant urges the Court to infer from his mere presence during the transfer of possession of the vehicle from Ms. Suchomel to Mr. Prescott that Ms. Suchomel impliedly granted defendant permission to operate the vehicle. (Doc. 64, at 3). Defendant is thus, at best, "an unauthorized-driver-once-removed" and is not entitled to Fourth Amendment protections in the vehicle. *United States v. Long*, 870 F.3d 792, 797 (8th Cir. 2017), *vacated and affirmed*, 906 F.3d 720 (8th Cir. 2018). Critically, defendant's argument requires the Court to ignore the testimony of Ms. Suchomel herself. At the suppression hearing, Ms. Suchomel testified that although she did not explicitly tell Mr. Prescott that no one else could drive the vehicle, she would have objected to anyone else driving it if Mr. Prescott had asked. (Doc. 61, at 16–17). "Yes, I would have [objected] because, you know, Curtis asked me, you know, to rent it, and I assumed that it was just for him, you know, that he would be, you know, you

know, in control over the vehicle since, you know, he asked me for it." (*Id.*, at 17). There was thus no authority—implicit or otherwise—granted to defendant by the lessee. Regardless of what defendant believes Ms. Suchomel *should* have assumed about his presence during the rental process, defendant "needed to make some additional showing of consensual possession to satisfy standing requirements. *United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir. 1995). *See also Bettis*, 946 F.3d at 1027 (stating that a defendant moving for suppression bears the burden of proving standing by a preponderance of the evidence).

Defendant's other arguments attempt at an inversion of the evidentiary burden here. Specifically, defendant argues that the short amount of time he possessed the vehicle does not diminish his expectation of privacy in the context of a rental vehicle. (Doc. 64, at 4). Defendant has the burden to show that an expectation of privacy exists in the first place, however. The burden is not on the government to show that an objectively reasonable expectation of privacy does not exist. Judge Roberts found that the defendant's historical use of the vehicle was extremely limited, likely "no more than several hours." (Doc. 57, at 17). Although defendant is correct that a few hours could be a substantial proportion of the total use of a rented vehicle, this point does not overcome the fact that defendant did not have permission to use the vehicle to begin with, and certainly does not support an objective expectation of privacy on its own.

Finally, defendant argues that his possession and control of the vehicle, although not dispositive, "is the most important factor" in determining the existence of a reasonable expectation of privacy. (Doc. 64, at 5). The Court disagrees. Defendant correctly points out that "[o]ne of the main rights attaching to property is the right to exclude others, and, in the main, one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy in by virtue of the right to exclude." (*Id.*, at 4–5) (quoting *Byrd*, 138 S. Ct. at 1527). Critical to this relationship

between possession and privacy is that a person *lawfully* possess the property. Defendant mistakenly substitutes the "implied permission" he imagines he obtained from Ms. Suchomel in place of the lawfulness his possession requires before it can be given any weight. (*Id.*). To be sure, the Court does not infer that defendant's possession of the vehicle was unlawful. The absence of evidence of unlawfulness is not an adequate substitute for affirmative evidence of lawful possession, however. *Muhammad*, 58 F.3d at 355 (holding that defendant "needed to make some additional affirmative showing of consensual possession to satisfy the standing requirements."). Defendant could have elicited testimony from Mr. Prescott showing some transfer of authority to defendant. He did not do so. Nor did he provide any other evidence of lawful possession of the vehicle. Defendant's failure to provide anything more than inference in support of his claim, coupled with the testimony of Ms. Suchomel highlighted above, is sufficient to convince the Court that he did not have an objectively reasonable expectation of privacy in the U-Haul, regardless of what his subjective expectation may have been. Defendant's objection on this ground is **overruled**.

Based on these conclusions—and after reviewing the unobjected-to conclusions of the R&R vis-à-vis the standing issue for plain error and finding none—the Court agrees with Judge Roberts that defendant does not have standing to mount a Fourth Amendment challenge to the search of the U-Haul. Although this conclusion is fatal to defendant's underlying motion to suppress, the Court will nevertheless address defendant's other objections as well.

### B. Probable Cause to Search the U-Haul

Judge Roberts found that law enforcement officers possessed the probable cause necessary to conduct a warrantless search of the U-Haul. (Doc. 57, at 28–34). Specifically, he found that probable cause was supported by the following facts: (1) defendant was unable to provide current documentation for the U-Haul, (2) defendant

had parked the U-Haul in front of a well-known drug house, (3) three people—none of whom apparently knew defendant—were in the back of the U-Haul, (4) defendant had a known history of drug use and manufacturing, and (5) defendant stated that he was "going back to prison." (*Id.*, at 34). Defendant objects to these findings and argues that the facts here "might have 'justified the officer's suspicion that the person used drugs, they do not rise to the level necessary to establish probable cause to believe that the vehicle . . . contained contraband.'" (Doc. 64, at 7) (citing *United States v. Wanless*, 882 F.2d 1459, 1466 (9th Cir. 1989) (cleaned up).

As discussed above, warrantless searches are presumptively unconstitutional unless they fall within the ambit of one of the "jealously and carefully drawn" exceptions. *Coolidge*, 403 U.S. at 454–55 (quoting *Jones v. United States*, 357 U.S. 493, 499 (1958)). On such exception is the co-called automobile exception. "To conduct a warrantless search under the automobile exception, the only requirement is that law enforcement officers must have probable cause to believe that the vehicle contains contraband or other evidence of criminal activity." *United States v. Maccani*, No. 20-CR-90-CJW-MAR, 2021 WL 943109, at *16 (N.D. Iowa Mar. 12, 2021). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003). "The probable cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (internal citations and quotations omitted). "[T]he mere probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, is all that is required." *United States v. Winarseke*, 715 F.3d 1056, 1067 (8th Cir. 2013). "The substance of all the definitions of probable cause is a reasonable ground for belief of

guilt." *Brinegar v. United States*, 338 U.S. 160, 176 (1948) (internal citations and quotations omitted).

Defendant relies heavily on the Ninth Circuit Court of Appeals' holding in *Wanless* to support his argument. Defendant's reliance is misplaced for several reasons. First, *Wanless* is not binding on this Court. *See Hart v. Massanari*, 266 F.3d 1155, 1173 (9th Cir. 2001) ("The courts of appeals, and even the lower courts of other circuits, may decline to follow the rule we announce—and often do.").

Second, as persuasive authority, the rationale expressed in *Wanless* is not especially compelling. In *Wanless*, law enforcement officers stopped two vehicles travelling together for speeding. 882 F.3d at 146. Each vehicle contained two passengers. *Id.* The defendant was the passenger in the first vehicle. None of the people stopped could produce a driver's license or other identification upon request except the passenger in the second vehicle, who had a Portland, Oregon identification card. *Id.* at 1461. Despite being referred to as "Jay" by the driver of his vehicle, the defendant identified himself to police as William Earl Wanless. *Id.* The defendant was hesitant to give police his date of birth. *Id.* Despite the other three individuals telling police that they were travelling to Portland, the defendant told police that he was travelling to Seattle. *Id.* The only official paperwork for either of the vehicles any of the passengers could produce was a title to the second vehicle which was not in any of the passengers' names. *Id.* After placing the defendant under arrest for providing false information, police located needle marks on his arm and the defendant admitted that he had used drugs two days prior. *Id.* Police also discovered a needle cap and an empty bindle in his pocket. *Id.*

Because the district court found that the search of the defendant's person was illegal, the Ninth Circuit distinguished the circumstances leading up to the search of the defendant from the facts discovered upon searching the defendant. The court nevertheless

17

considered all of these facts in its probable cause analysis because "even considering the evidence seized through the unlawful search of Wanless, [the court] conclude[d] that the evidence is far too scanty to establish probable cause for an investigative search of the two vehicles." *Id.* at 1455. Describing the facts police observed prior to the search of the defendant as "quite innocuous," the court found that they "would not in and of themselves suggest that either of the two vehicles contained contraband or even that criminal wrongdoing was involved." *Id.* at 1466. With respect to the needle and empty bindle found on the defendant, the needle marks on his arm, and his admission to using drugs within the past two days, the court found that these facts justified a "suspicion that Wanless used drugs," but that suspicion did "not rise to the level necessary to establish probable cause to believe that the vehicles contained . . . contraband." *Id.*

This Court respectfully disagrees with the Ninth Circuit's conclusions. The proposition that nothing about the stop or the relationships between the individuals stopped indicates criminal wrongdoing is in tension with the fact that both drivers were arrested for driving without a valid license, which is itself criminal wrongdoing. Further, the probable cause standard does not require certainty of criminal activity. Indeed, an amalgamation of otherwise innocent behaviors can and often does amount to probable cause when considered in the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983) ("[I]nnocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to *sub silentio* impose a drastically more rigorous definition of probable cause than the security of our citizens demands."). Although it acknowledged the incriminating nature of the evidence of defendant's drug use, the court downplayed its significance. Contrary to the Ninth Circuit's concession in *Wanless*, drug paraphernalia found on a person, needle marks on their arms, and an admission of drug use does not just support a *suspicion* of drug use; it is *proof* of drug use. Such proof of drug use—and probable addiction—in one of the

18

passengers, when combined with the evasive behavior of the other passengers, the conflicting accounts of their destinations and purpose, and the lack of lawful documentation—all refracted through the lens of the law enforcement officers' training and experience—amounts to probable cause to believe evidence of at least drug use would be located within the first vehicle. *See, e.g.*, *United States v. Soderman*, 983 F.3d 369, 375 (8th Cir. 2020) (holding that observation of after-market wires supporting inference of vehicle modification to conceal drugs, energy drinks and snacks indicating long drive, defendant's disheveled appearance and malodorous state, and defendant's agitation, nervousness, and confusion support existence of probable cause).

The *Wanless* court enumerated a series of facts which—in its estimation—would have supported probable cause had they been present, and in doing so provided evidence of that court's inappropriately heightened understanding of the probable cause standard. Namely, the police there "did not detect any drug or drug-related odors," they did not see anything "they could reasonably believe were controlled substances," and there was nothing in the record indicating that any of the police officers "had any prior information or intelligence about" the passengers. *Wanless*, 882 F.2d at 1466. In short, the police officers failed to observe any hard evidence of criminal activity attributable to the group. As discussed above, probable cause requires only a "fair probability" or "a substantial chance of criminal activity," not "an actual showing of criminal activity" as demanded by the *Wanless* court. *See Wells*, 347 F.3d at 287; *Winarseke*, 715 F.3d at 1067. Despite defendant's arguments to the contrary here, the probable cause standard does not require the level of certainty implied in *Wanless*.

The final reason defendant's reliance on *Wanless* is misplaced—and the principal basis of his objection—is that the circumstances encountered by officers here are distinguishable from the facts in *Wanless*. As Judge Roberts explained, unlike *Wanless*, police responded to the vehicle here based on a suspicion of sex trafficking, not mere

19

traffic violations.  (Doc. 61, at 74).  When police officers made contact with the vehicle, it was parked in front of a well known "drug house, a flop house."  (*Id.* at 64).  Like the defendant in *Wanless*, defendant here made an incriminating statement, that he was "going back to prison anyways."  (*Id.*, at 43).  Like the defendant in *Wanless,* defendant here gave officers false names or aliases and otherwise failed to provide information or documentation proving his identity.  Unlike *Wanless*, police here were able to piece together the scant information they did have and discovered that defendant had an active warrant for violating the terms of his probation relating to prior drug convictions.  (*Id.*, at 46).  The police officers here therefore possessed substantial background information on defendant and the location before the search occurred.  That background information, considered together with the suspicious circumstances of his possession of the U-Haul, the unaccounted-for passengers in the back who could not identify him, and the needle cap that fell from defendant's lap when he exited the vehicle, are more than sufficient to constitute probable cause.  Defendant's objection on this ground is **overruled.**

### C.     *Search Incident to Arrest*

Defendant's final objection is to Judge Roberts' finding in the alternative that the search of the U-Haul was just as a search incident to arrest.  (Doc. 57, at 34–40).  Specifically, Judge Roberts found that the search was justified under the second prong of the *Gant* test allowing officers to conduct a search to prevent evidence of a crime from being tampered with, covered up, destroyed or otherwise rendered unreachable to law enforcement.  (*Id.*, at 38–40) (citing *Arizona v. Gant*, 556 U.S. 332 (2009)).  Finding that the facts here are "nearly indistinguishable" from the Court's prior ruling in *United States v. Leiva*, No. 19-CR-79-CJW-MAR, 2020 WL 556400 (N.D. Iowa Feb. 4, 2020), Judge Roberts found that officers were entitled to search the U-Haul for additional evidence.  (Doc. 57, at 38).  Defendant objects, arguing that law enforcement officers possessed sufficient evidence of the crime of defendant's arrest—interference with official

Case 1:21-cr-00024-CJW-MAR   Document 65   Filed 10/19/21   Page 20 of 22

acts—and that there was no reason to believe further evidence of this crime would be found inside the U-Haul. (Doc. 64, at 7–8).

A search incident to a lawful arrest is an exception to the warrant requirement that is justified either by concern for officer safety or the need to collect evidence of the offense of arrest. *United States v. Robinson*, 414 U.S. 218, 226 (1973). Under this exception, officers may search "the arrestee's person and the area within his immediate control." *Chimel v. California*, 395 U.S. 752, 763 (1969). Officers may search items in the arrestee's vehicle if the arrestee is within reaching distance of the vehicle during the search or "if the police have reason to believe that the vehicle contains evidence relevant to the crime of arrest." *Davis v. United States*, 131 S. Ct. 2419, 2425 (2011) (internal citation and quotation marks omitted). "Even after an arrestee has been secured in the back of a police car, officers may search the vehicle incident to an arrest if their observations provide a 'reasonable basis' to conclude that evidence of the crime of arrest 'might be found in the vehicle.'" *United States v. Allen*, 713 F.3d 382, 387 (8th Cir. 2013) (quoting *United States v. Tinsley*, 365 Fed. App'x 709, 711 (8th Cir. 2010) (per curiam)).

The Court agrees with Judge Roberts' conclusion. The facts here are slightly distinguishable from *Leiva* in that the officers here had a prior arrest photograph of defendant and arrest warrants prior to his arrest. Defendant correctly notes these distinctions but misses the overall thrust of the Court's decision in *Leiva*. Police are not obligated to refrain from further searches or investigation simply because they have enough evidence of a crime. Police are entitled to "continue to search until they have uncovered all the evidence that is within their lawful authority to obtain." 2020 WL 556400, at *15. Police had sufficient evidence that defendant had interfered with official acts by providing a false name at the time of his arrest. They did not yet have his driver's license, passport, or other form of identification documents which may have further

supported their case. It was reasonable to assume that such evidence may have been located within the U-Haul. Thus, a search of the U-Haul for identification documents subsequent to defendant's arrest for interference with official acts was justified under the search incident to arrest exception to the warrant requirement. Defendant's objection on this ground is **overruled**.

## V. CONCLUSION

For the reasons stated above, defendant's objections are **overruled**. (Doc. 64). The Court **adopts** Judge Roberts' Report and Recommendation (Doc. 57) and **denies** defendant's Motion to Suppress (Doc. 21).

**IT IS SO ORDERED** this 19th day of October, 2021.

_____
C.J. Williams
United States District Judge
Northern District of Iowa